United States District Court
for the
Southern District of Florida

| | | |
|---|---|---|
| Gladys Soto, individually and as guardian and mother of Arnaldo Rios-Soto, Plaintiff, | ) ) ) ) | |
| v. | ) ) | Civil Action No. 17-22090-Civ-Scola |
| City of North Miami, and others, Defendants. | ) ) ) | |

### Omnibus Order on the Defendants' Motions to Dismiss

Plaintiff Gladys Soto brings this action on behalf of herself and her son, Arnaldo Rios-Soto, against the City of North Miami (the "City"), Detective Michael Gaudio, and Officers Jonathan Aledda, Kevin Warren, Angel Requejado, and Kevin Crespo for violations of Rios-Soto's civil rights and the commission of various intentional torts. All of the Defendants have moved to dismiss the Complaint (ECF Nos. 14, 15, 27.) For the reasons set forth below, the Court **grants** the City's motion to dismiss (**ECF No. 14**); **grants** Defendant Aledda's motion to dismiss (**ECF No. 27**); and **grants in part and denies in part** Defendants Warren, Requejado, Crespo, and Gaudio's motion to dismiss (**ECF No. 15**).

## 1.    Background

This case concerns an interaction between North Miami police officers and Gladys Soto's son, Arnaldo Rios-Soto, that had tragic consequences. Rios-Soto is twenty-seven years old and has Autism Spectrum Disorder, an intellectual disability, and limited speech ability. (Compl. ¶¶ 4, 21, ECF No. 1.) He can only say select words and tends to repeat phrases used by those around him, as well as in movies and television shows. (*Id.* ¶ 21.) Rios-Soto undergoes "continuous residential behavioral therapy to control aggressive behaviors and to assist with everyday life experiences." (*Id.* ¶ 21.) After residing in several behavioral-focused group homes from 2014 to 2016, Rios-Soto moved to the Miami Achievement Center for the Developmentally Disabled Panther group home ("MACtown") in North Miami in June of 2016. (*Id.* ¶¶ 4, 22-24.) The Complaint alleges that MACtown is the only group home in South Florida that offers treatment for intensive behavioral challenges, and was geographically desirable because it allowed Rios-Soto to live close to his mother

and sister. (*Id.* ¶ 23.) At MACtown, Rios-Soto developed a good relationship with his behavioral analyst, Charles Kinsey. (*Id.* ¶ 25.)

On July 18, 2016, Kinsey was providing one-on-one care for Rios-Soto. (*Id.* ¶ 26.) After Kinsey gave Rios-Soto his medication around 4:00 p.m., Rios-Soto began to yell and move about the group home. (*Id.*) Rios-Soto then fled MACtown carrying a toy truck. (*Id.*) Kinsey followed Rios-Soto, but was not alarmed because Rios-Soto had left the group home before.[1] (*Id.* ¶ 27.) Rios-Soto eventually sat on the ground in the middle of the street at the intersection of NE 127th Street and NE 14th Avenue in North Miami. (*Id.* ¶ 29.) Kinsey unsuccessfully tried to convince Rios-Soto to stand up and return to the group home. (*Id.* ¶ 29.)

Around 5:00 p.m., a bystander called 9-1-1 and allegedly told the operator that she "thought that there was a Spanish man who possessed what appeared to be a gun and he appeared suicidal." (*Id.* ¶ 30.) She then told the operator that "she thought 'the Spanish guy is a mentally ill person,'" and stated that she was not sure if he was holding a gun. (*Id.*) The Miami-Dade Police Dispatcher sent out a call that there was a suicidal person holding a gun to his head in the middle of the street. (*Id.* ¶ 31.) Several police vehicles responded with their lights and sirens activated. (*Id.*)

At 5:02 p.m., Officers Crespo and Bernadeau arrived at the scene armed with assault rifles. (*Id.* ¶ 32.) They directed Kinsey to get on the ground, and Kinsey complied. (*Id.* ¶ 33.) Kinsey began pleading with Rios-Soto to cooperate, but Rios-Soto did not understand what was happening and was smiling. (*Id.* ¶ 34.) Throughout the incident, Kinsey intermittently attempted to shout information to Officers Bernadeau and Crespo, as well as Rios-Soto. (*Id.* ¶ 35.) Kinsey told the officers repeatedly that Rios-Soto was holding a toy truck, not a gun. (*Id.* ¶¶ 35, 37.)

The Complaint alleges that Commander Emile Hollant was positioned too far away to determine whether the object in Rios-Soto's hands was a gun, but nevertheless, at 5:05 p.m. he announced over the radio that it looked like Rios-Soto was holding a gun. (*Id.* ¶ 36.) Officers Warren and Aledda were also allegedly too far away to see what Rios-Soto was holding, but Officer Warren noted that Rios-Soto was playing with something. (*Id.* ¶¶ 38-39, 45.) At some point, Officer Aledda asked Officer Warren whether he thought the object was a gun, and Officer Warren stated that he was not sure. (*Id.* ¶ 46.)

At 5:06 p.m., Officer Bernadeau announced over the radio that Kinsey was saying that the object was a toy car, and told the officers that they should use caution. (*Id.* ¶¶ 36, 40.) Officer Bernadeau was then able to visually confirm that the object was not a gun, and announced over the radio that the

---

[1] MACtown is not permitted to lock down its residents. (*Id.* ¶ 27.)

object did not appear to be a firearm. (*Id.* ¶ 41.) The Complaint alleges that Officer Crespo heard Officer Bernadeau's transmission. (*Id.*) Officer Crespo also observed that Rios-Soto was playing with the object and that "'[h]is behavior seemed a little unusual . . . as if he had some sort of mental disability.'" (*Id.* ¶ 43.)

Eighty-five seconds after Officer Bernadeau told the officers to use caution, and thirty seconds after he announced his visual confirmation that the object was not a gun, Officer Aledda shot three rounds at Rios-Soto. (*Id.* ¶ 47.) Officer Aledda missed Rios-Soto, but one of the bullets hit Kinsey, whose blood splattered onto Rios-Soto. (*Id.* ¶ 49.) Kinsey screamed, and Rios-Soto began making "animalistic" noises. (*Id.*) Officer Aledda then allegedly announced over the radio that Rios-Soto was holding a toy gun, that no one was injured, and that Rios-Soto required psychiatric institutionalization under the Florida Mental Health Act (the "Baker Act"). (*Id.* ¶ 50.)

After the shooting, Rios-Soto and Kinsey were placed in handcuffs, and Officers Crespo and Bernadeau kept them at gunpoint. (*Id.* ¶¶ 51-52, 56.) An Emergency Medical Technician eventually requested that Kinsey's handcuffs be removed, and Rios-Soto was placed in Officer Warren's patrol car, still handcuffed. (*Id.* ¶¶ 56-57.) Rios-Soto could not perform self-soothing behaviors with his hands restrained, and a bystander could hear Rios-Soto making "animalistic" and screeching sounds while in the car. (*Id.* ¶¶ 55, 57.) At some point, Detective Gaudio arrived on the scene and was advised that Rios-Soto may have "mental issues." (*Id.* ¶ 58.)

Around 5:30 p.m., Clint Bower, the President and Chief Executive Officer of MACtown, arrived at the scene, but was not permitted to see anyone for at least thirty minutes. (*Id.* ¶ 61.) Around 6:00 p.m., Rios-Soto was transferred to Officer Requejado's car at the direction of Detective Gaudio. (*Id.* ¶ 60.) Officer Requejado attempted to question Rios-Soto, which led him to believe that Rios-Soto had a low mental capacity. (*Id.*) Detective Gaudio eventually met with Bower and advised him that Rios-Soto was in protective custody because "he was acting 'kinda loopy.'" (*Id.* ¶ 62.) Bower advised Detective Gaudio that Rios-Soto was autistic, had an IQ of 40, and might be aggressive. (*Id.* ¶ 63.) Bower also advised Gaudio that Rios-Soto was a resident of MACtown and that he had a guardian. (*Id.* ¶¶ 63, 66.)

Detective Gaudio then took Rios-Soto to the North Miami Police Station to try to obtain a statement. (*Id.* ¶ 67.) Detective Gaudio advised Bower that he could pick up Rios-Soto at 8:30 p.m. (*Id.* ¶ 68.) He did not obtain consent from either Bower or Rios-Soto's mother, Gladys Soto. (*Id.* ¶ 67.) Detective Gaudio and Officer Requejado interrogated Rios-Soto at the police station, during which time Rios-Soto remained handcuffed. (*Id.* ¶¶ 72-73.) When Bower arrived

at the station, he was told to wait and was not informed that Rios-Soto was being interrogated. (*Id.*) During the interrogation, it was clear that Rios-Soto could not respond to questions other than by answering in the affirmative or echoing the question that had been asked of him. (*Id.* ¶ 75.)

Sometime after 8:30 p.m., Rios-Soto was returned to MACtown. (*Id.* ¶ 80.) That night, Rios-Soto began to attack the MACtown staff and residents. (*Id.* ¶ 81.) He later escaped from the group home and returned to the scene of the shooting, beating the ground and shouting "police shoot" repeatedly. (*Id.*) Rios-Soto's behavior could not be controlled, and he was subsequently institutionalized in Aventura Hospital Psychiatric Ward. (*Id.* ¶ 82.) As a result of the trauma he experienced, Rios-Soto's condition regressed and his behavior became more uncontrolled. (*Id.* ¶ 83.) Therefore, he needed to be placed in a group home with a more intensive behavioral program. (*Id.*) Since there were no appropriate group homes available in South Florida, Rios-Soto remained in the Aventura Hospital for thirty-four days. (*Id.* ¶ 84.) During that time, Rios-Soto repeatedly made gun sounds, appeared terrified of any person wearing a uniform, and exhibited violent behavior, injuring several members of the staff. (*Id.* ¶ 85.)

The only facility that could meet Rios-Soto's needs was an institutionalized placement in Central Florida. (*Id.* ¶ 86.) Gladys Soto moved to Ocala, Florida in order to be near her son. (*Id.* ¶ 88.) Soto alleges that as a result of the trauma of the shooting and arrest, Rios-Soto will continue to suffer extreme emotional distress and will need the highest degree of intensive behavioral services in order to become integrated into the community again. (*Id.* ¶ 87.)

Soto filed this suit on June 7, 2017, asserting the following causes of action against the individual officers: (1) battery; (2) assault; (3) false arrest and imprisonment; (4) civil conspiracy to engage in false arrest and false imprisonment; (5) intentional infliction of emotional distress; (6) negligent infliction of emotional distress; and (7) two counts of 42 U.S.C. § 1983 violations. With respect to the City of North Miami, Soto has asserted a 42 U.S.C. § 1983 violation for the City's failure to adequately train its officers, a violation of the Americans with Disabilities Act, 42 U.S.C. § 12132 ("ADA"), and a violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("Rehabilitation Act"). Finally, Soto asserts claims under the Fair Housing Act, 42 U.S.C. § 3604 ("FHA") and the Civil Rights Act of 1866, 42 U.S.C. § 1982, against all Defendants, alleging that as a result of their discriminatory treatment of Rios-Soto and Kinsey, the Defendants have made housing unavailable to Rios-Soto and he was forced to relocate to Central Florida.

## 2.    Legal Standard

Federal Rule of Civil Procedure 8(a) requires "a short and plain statement of the claims" that "will give the defendant fair notice of what the plaintiff's claim is and the ground upon which it rests." Fed. R. Civ. P. 8(a). The Supreme Court has held that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (internal citations omitted).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662 (2009) (quotations and citations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Thus, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 1950. When considering a motion to dismiss, the Court must accept all of the plaintiff's allegations as true in determining whether a plaintiff has stated a claim for which relief could be granted. *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984). For purposes of Rule 12(b)(6), a court generally may not look beyond the pleadings, which includes any information attached to a complaint. *U.S. ex. Rel. Osheroff v. Humana, Inc.,* 776 F.3d 805, 811 (11th Cir. 2015) (internal citations omitted).

## 3.    Analysis

Collectively, the Defendants have moved to dismiss each count of the Complaint. The Court will first address the claims against the individual Defendants, then the claims asserted against the City, and, finally, will address the claims asserted against all Defendants.

### A. Common Law Claims Against the Individual Defendants

Counts One through Six of the Complaint assert common law claims of battery, assault, false arrest and imprisonment, civil conspiracy to engage in false arrest and imprisonment, intentional infliction of emotional distress, and negligent infliction of emotional distress against the individual Defendants. Soto has conceded that the claim for civil conspiracy should be dismissed, but argues that the other common law claims should not be dismissed. (Resp. at 9-15, ECF No. 20).

Pursuant to Florida Statute § 768.28(9)(a), an officer may not be held personally liable "or named as a party defendant in any action for any injury or damage suffered as a result of any act, event, or omission of action in the scope of his or her employment or function, unless such officer . . . acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." Absent a showing of bad faith, the exclusive remedy for injuries or damages caused by an officer is a suit against the governmental entity itself. Fla. Stat. § 768.28(9)(a).

For purposes of § 768.28(9)(a), "Florida courts equate bad faith with the actual malice standard." *Guerrera v. Palm Beach Cty. Sheriff's Office*, 657 Fed. Appx. 886, 892 (11th Cir. 2016) (citing *Parker v. State of Fla. Bd. of Regents ex rel. Fla. State Univ.*, 724 So.2d 163, 167 (Fla. 1st Dist. Ct. App. 1998)). In order to establish actual malice, "there must be conduct much more reprehensible and unacceptable than a mere intentional tort." *Duyser by Duyser v. School Bd. of Broward Cty.*, 573 So.2d 130, 131 (Fla. 4th Dist. Ct. App. 1991) (per curiam); *see also Btesh v. City of Maitland, Fla.*, No. 6:10-cv-71-Orl-19DAB, 2011 WL 3269647, at *27 (M.D. Fla. July 29, 2011) (quoting *Richardson v. City of Pompano Beach*, 511 So.2d 1121, 1123 (Fla. 4th Dist. Ct. App. 1987)). Thus, an officer "can commit a wrongful, and even intentional, act and still lack bad faith." *Dunn v. City of Boynton Beach*, 192 F.Supp.3d 1310, 1325-26 (S.D. Fla. 2016) (Marra, J.) (citations omitted). Actual malice depends on subjective intent. *Id.*

Soto has generally alleged that "the individual defendants acted in bad faith, with malicious purpose, and in a manner exhibiting wanton and willful disregard of Mr. Rios-Soto's rights or safety." (*See, e.g.*, Compl. ¶ 95.) However, this conclusory allegation is not sufficient, on its own, to establish that the officers are not entitled to immunity. *See P.C.B. P'ship v. City of Largo*, 549 So.2d 738, 741 (Fla. 2d Dist. Ct. App. 1989) (affirming dismissal of counts directed toward city commissioners because the allegations that the commissioners acted maliciously were conclusory). Moreover, the factual allegations concerning the actions of the individual officers do not support an inference that any of them had a subjective intent to act with a malicious purpose. *See Richardson*, 511 So.2d at 1124 (holding that allegations that a police officer committed intentional torts during an arrest, including using excessive force and false arrest, are insufficient on their own to establish bad faith). Therefore, the individual Defendants are entitled to immunity with respect to Counts One through Six.

## B. 42 U.S.C. § 1983 Claims Against the Individual Defendants

Count Seven of the Complaint asserts a claim against the individual Defendants under 42 U.S.C. § 1983 for unlawful arrest and imprisonment in violation of the Fourth and Fourteenth Amendments, and Count Eight asserts a § 1983 claim for violation of Rios-Soto's right to be free from unreasonable searches and seizures under the Fourth and Fourteenth Amendments. Any person who deprives another "of any rights, privileges, or immunities secured by the Constitution and laws," while acting under color of state law, is liable to the person whose rights were violated. 42 U.S.C. § 1983. This law "creates no substantive rights; it merely provides remedies for deprivations of rights established elsewhere." *City of Okla. City v. Tuttle*, 471 U.S. 808, 816 (1985). To state a claim under § 1983, a plaintiff must allege that: (1) the defendant deprived him of a right secured by the United States Constitution or federal law; and (2) such deprivation occurred under color of state law. *U.S. Steel, LLC v. Tieco, Inc.*, 261 F.3d 1275, 1288 (11th Cir. 2001). In addition, a plaintiff must allege and establish an affirmative causal connection between the defendant's conduct and the constitutional deprivation. *See, e.g., Troupe v. Sarasota Cty.*, 419 F.3d 1160, 1165 (11th Cir. 2005).

As an initial matter, the Court notes that although Defendant Aledda is mentioned in the "Wherefore" clauses of Counts Seven and Eight, the allegations included in those counts only allege that Defendants Warren, Requejado, Crespo, and Gaudio violated Rios-Soto's Constitutional rights. (Compl. ¶¶ 133-134, 141-144.) Furthermore, the general factual allegations do not allege that Defendant Aledda unlawfully imprisoned or arrested Rios-Soto or unreasonably searched or seized him. Soto argues in response to Defendant Aledda's motion to dismiss that Eleventh Circuit precedent holds that "shooting an unarmed person who is not acting in a manner posing a risk of great bodily harm to an officer violates the suspect's fourth amendment right to be free of excessive force." (Pl.'s Resp. at 14-15, ECF No. 30.) However, Soto has not actually alleged that Defendant Aledda violated Rios-Soto's right to be free from excessive force, and neither Counts Seven nor Eight allege that any of the Defendants violated Rios-Soto's right to be free of excessive force. Therefore, the Court dismisses Counts Seven and Eight as to Defendant Aledda.

Defendants Warren, Requejado, Crespo, and Gaudio argue that they are entitled to qualified immunity. (*See, e.g.*, Mot. to Dismiss at 9-13, ECF No. 15.) "Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kingsland v. City of Miami*, 382 F.3d 1220, 1231 (11th Cir. 2004) (quotation marks omitted). The Supreme Court has "'stressed the importance of

resolving immunity questions at the earliest possible stage in litigation.'" *Pace v. Capobianco*, 283 F.3d 1275, 1284 (11th Cir. 2002) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). To claim qualified immunity, a public official must first establish that he was engaged in a "discretionary duty." *Mercado v. City of Orlando*, 407 F.3d 1152, 1156 (11th Cir. 2005). The Eleventh Circuit has noted that officers trying to apprehend a potentially suicidal subject are "clearly engaged in a discretionary capacity." *Mercado*, 407 F.3d at 1156; *see also, Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (holding that a police officer is engaged in a discretionary duty when making an arrest).

Once it is established that a public official was acting in a discretionary capacity, the burden shifts to the plaintiff to establish "both that the defendant committed a constitutional violation and that the law governing the circumstances was already clearly established at the time of the violation." *Youmans v. Gagnon*, 626 F.3d 557, 526 (11th Cir. 2010). "This objective-reasonableness test provides qualified immunity protection to 'all but the plainly incompetent or those who knowingly violate the law.'" *Kirkland v. Mosaic Fertilizer, LLC*, No. 8:14-CV-1715, 2015 WL 4042100, at *2 (M.D. Fla. July 1, 2015) (quoting *Montoute v. Carr,* 114 F.3d 181, 184 (11th Cir. 1997)). At the motion to dismiss stage, "unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." *Cottone v. Jenne*, 326 F.3d 1352, 1357 (11th Cir. 2003) (internal quotations and citations omitted).

### 1. Whether the Officers Violated Rios-Soto's Constitutional Rights

Count Seven alleges that Defendants Warren, Requejado, Crespo, and Gaudio unlawfully arrested Rios-Soto and imprisoned him in a patrol car and later at the police station without probable cause, in violation of his Fourth and Fourteenth Amendment rights. Count Eight alleges that these same Defendants violated Rios-Soto's rights under the Fourth and Fourteenth Amendments to be free from unreasonable searches and seizure, and his rights under the Fourteenth Amendment to equal protection and due process. The factual allegations supporting both counts are essentially the same, and the Defendants and the Plaintiff have not distinguished between the two counts in analyzing whether the Defendants are entitled to qualified immunity. Both counts essentially allege that both the arrest and subsequent detention and restraint of Rios-Soto were unlawful. Therefore, the Court will analyze whether the Plaintiff has stated a claim for unlawful arrest and/or false imprisonment.

"A warrantless arrest without probable cause violates the Constitution and provides a basis for a section 1983 claim." *Kingsland*, 382 F.3d at 1226,

1232 (citations omitted) ("Plainly, an arrest without probable cause violates the right to be free from an unreasonable search under the Fourth Amendment."). However, the existence of probable cause constitutes an absolute bar to a § 1983 claim of false arrest. *Rankin v. Evans*, 133 F.3d 1425, 1435 (11th Cir. 1998). For probable cause to exist, "an arrest must be objectively reasonable based on the totality of the circumstances." *Lee v. Ferraro*, 284 F.3d 1188, 1195 (11th Cir. 2002). This standard is met when reasonably trustworthy facts and circumstances lead a prudent person to believe that an individual has violated the law, is violating the law, or will violate the law. *Kingsland*, 382 F.3d at 1226.

Nevertheless, even if the facts demonstrate that an arrest was made without probable cause, officers are still entitled to qualified immunity if there was *arguable* probable cause for the arrest. *Id.* at 1232. "Whether an officer has probable cause or arguable probable cause depends on the elements of the alleged crime and the operative fact pattern." *Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 735 (11th Cir. 2010) (internal citations omitted). Thus, an officer is entitled to qualified immunity if "'reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed to arrest' the plaintiffs." *Scarbrough v. Myles*, 245 F.3d 1299, 1302 (11th Cir. 2001) (quoting *Redd v. City of Enterprise*, 410 F.3d 1378, 1384 (11th Cir. 1998)); *see also Jones v. Cannon,* 174 F.3d 1271, 1283 n.3 (11th Cir. 1999) ("Arguable probable cause, not the higher standard of actual probable cause, governs the qualified immunity inquiry."). Arguable probable cause may exist where a public official makes a "good faith," "reasonable mistake" in the legitimate performance of his or her duties. *Kingsland*, 382 F.3d at 1233. But a public official who "recklessly or deliberately" violates the law is not entitled to immunity under the arguable-probable-cause doctrine. *Id.* at 1233–34 ("The principles behind qualified immunity would be rendered meaningless if such immunity could be invoked to shelter officers who, because of their own interests, allegedly flout the law, abuse their authority, and deliberately imperil those they are employed to serve and protect.").

Defendants Warren, Requejado, Crespo, and Gaudio argue that the allegations in the Complaint establish that there was probable cause to restrain Rios-Soto and place him in protective custody under the Hal S. Marchman Alcohol and Other Drug Services Act, Florida Statute § 397,672 (the "Marchman Act"). (Mot. to Dismiss at 11, ECF No. 15.) Pursuant to the Marchman Act, a person meets the criteria for involuntary admission, including protective custody,

[I]f there is good faith reason to believe that the person is substance abuse impaired or has a co-occurring mental health disorder and, because of such impairment or disorder:

(1) Has lost the power of self-control with respect to substance abuse; and

(2)(a) Is in need of substance abuse services and, by reason of substance abuse impairment, his or her judgment has been so impaired that he or she is incapable of appreciating his or her need for such services and of making a rational decision in that regard . . .; or

(b) Without care or treatment, is likely to suffer from neglect or refuse to care for himself or herself; that such neglect or refusal poses a real and present threat of substantial harm to his or her well-being; and that it is not apparent that such harm may be avoided through the help of willing family members or friends or the provision of other services, or there is substantial likelihood that the person has inflicted, or threatened to or attempted to inflict, or, unless admitted, is likely to inflict, physical harm on himself, herself, or another.

Fla. Stat. § 397.675. When a minor or an adult "appears to meet the involuntary admission criteria" set forth above, a law enforcement officer may implement protective custody measures if the person is brought to the attention of law enforcement or is in a public place. Fla. Stat. § 397.677.

In addition, the Complaint alleges that Defendant Aledda made a radio transmission stating that Rios-Soto required institutionalization under the Baker Act. (Compl. ¶ 50.) The Baker Act allows a law enforcement officer to take a person who appears to meet the criteria for involuntary examination into custody and deliver them to an appropriate facility. Fla. Stat. § 394.463(2)(a)(2). A person meets the criteria for involuntary examination if "there is reason to believe that the person has a mental illness and because of his or her mental illness . . . [t]he person is unable to determine for himself or herself whether examination is necessary;" and "[t]here is a substantial likelihood that without care or treatment the person will cause serious bodily harm to himself or herself or others in the near future, as evidenced by recent behavior." *Id.* at § 394.463(1).

The Eleventh Circuit has held that in the context of a mental-health seizure, the officer must have probable cause to believe the person is dangerous either to himself or others. *May v. City of Nahunta, Georgia*, 846 F.3d 1320, 1327-28 (11th Cir. 2017) (citing *Roberts v. Spielman*, 643 F.3d 899,

904 (11th Cir. 2011)). The allegations in the Complaint establish that a reasonable officer objectively could have believed that probable cause existed to seize Rios-Soto and place him in protective custody. The call sent out by the Miami-Dade Police Dispatcher stated that there was a suicidal person with a gun to his head in the middle of the roadway. (Compl. ¶ 31.) Although the Complaint alleges that Kinsey shouted to the officers when they arrived that Rios-Soto was only holding a toy car, the Complaint also alleges that the officers were initially positioned too far away to determine whether Rios-Soto was holding a gun. (*Id.* ¶¶ 35-36.) Despite the presence of the officers and their instructions to get on the ground, Rios-Soto remained sitting in the middle of the street "rocking front to back with the truck by his head." (*Id.* ¶¶ 41-42.) The Complaint alleges that Officer Crespo noticed that Rios-Soto's "'behavior seemed a little unusual . . . as if he had some sort of mental disability.'" (*Id.* ¶ 43.) Another officer stated that Rios-Soto "'looked like he was just in his own world, doing his own thing,'" and that "'he didn't look normal.'" (*Id.* ¶ 44.)

After Kinsey was shot, Rios-Soto "stood up and began to yell and making noises, which were described as either 'animalistic' or 'weird.'" (*Id.* ¶ 49.) The Complaint also alleges that at the time of the shooting, "it was clear that Arnaldo Rios-Soto had a significant developmental and intellectual disability . . . ." (*Id.* ¶ 54.) After Rios-Soto had been placed in the back of Warren's patrol car, Rios-Soto continued making "loud 'animalistic sounds and screeching noises.'" (*Id.* ¶ 57.) After Detective Gaudio arrived on the scene, the Complaint alleges that "[i]t was 'immediately clear' to Detective Gaudio that Rios-Soto 'suffered from some type of mental issue or on some time [sic] of narcotic as he was incapable of communicating.'" (*Id.* ¶¶ 58-59.) Around 6:00 p.m., Detective Gaudio advised Clint Bower that Rios-Soto was in protective custody. (*Id.* ¶ 62.) Bower then advised Gaudio that Rios-Soto was autistic and "might be aggressive." (*Id.* ¶ 63.)

These allegations establish that the officers had probable cause to believe that Rios-Soto was dangerous to himself and/or others, and that the requirements to take him into protective custody under either the Marchman or Baker Acts had been met. Therefore, the officers are entitled to qualified immunity with respect to the initial seizure of Rios-Soto.

However, under the Marchman Act, in order to implement protective custody measures, "after giving due consideration to the expressed wishes of the person," the officer may take the person to a hospital or detoxification center without using unreasonable force, or, in the case of an adult, may "detain the person for his or her own protection in any municipal or county jail or other appropriate detention facility." Fla. Stat. § 397.6772(1). Under the Baker Act, an officer must deliver the person to an appropriate facility for

examination. Fla. Stat. § 394.463(2)(a)2. Although Detective Gaudio initially informed Bower that Rios-Soto was in protective custody, he later told Bower that "Rios-Soto was going to be transported to the North Miami Police Station so he could try to obtain a statement." (*Id.* ¶ 67.) Rios-Soto was not taken to a hospital, jail, or other mental health facility. Moreover, despite the fact that Bower informed Gaudio that had a guardian, the Complaint alleges that Gaudio made no attempt to notify Soto that Rios-Soto was being taken into protective custody pursuant to § 397.6772(2) of the Marchman Act. Thus, the allegations in the Complaint establish that at some point after Rios-Soto had been handcuffed and placed in Gaudio's car, the intention was no longer to transport Rios-Soto to a hospital or other appropriate facility.

Accordingly, the Court must analyze whether Soto has stated a claim for false imprisonment based on Rios-Soto's continued detention after the decision was made not to take him into protective custody under the Marchman or Baker Acts. The Eleventh Circuit has recognized "[t]he constitutional right to be free from continued detention after it was or should have been known that the detainee was entitled to release." In order to state a § 1983 claim based on false imprisonment, a plaintiff must meet the elements of common law false imprisonment and establish that the imprisonment resulted in a violation of due process rights under the Fourteenth Amendment. *Campbell v. Johnson*, 586 F.3d 835, 840 (11th Cir. 2009) (citing *Cannon*, 1 F.3d at 1562-63). A plaintiff sufficiently states a common law claim of false imprisonment if the plaintiff alleges "an intent to confine, an act resulting in confinement, and the victim's awareness of confinement." *Id.* (citations omitted). The factual allegations in the Complaint sufficiently allege these elements.

In order to establish a due process violation, a plaintiff must establish that the defendant(s) acted with "deliberate indifference in violating the plaintiff's right to be free from continued detention after the defendant knew or should have known that the detainee was entitled to release." *May*, 846 F.3d at 1329 (citing *Campbell*, 586 F.3d at 840)). The Complaint alleges that Detective Gaudio initially told Bower that Rios-Soto was in protective custody. (Compl. ¶ 62.) However, Gaudio then told Bower that he was taking Rios-Soto to the police station to obtain a statement, and Gaudio and Requejado questioned Rios-Soto at the station. (*Id.* ¶¶ 67, 72.) The Complaint alleges that Rios-Soto remained handcuffed throughout the questioning at the police station, and also alleges that there was no "valid purpose" to question Rios-Soto. (*Id.* ¶¶ 73-74.)

Since Gaudio and Requejado failed to follow the procedures for placing Rios-Soto in protective custody, which was Gaudio's stated reason for detaining Rios-Soto, and because it is not clear from the face of the Complaint that there was arguable probable cause to detain Rios-Soto for any other reason, the

allegations in the Complaint are sufficient to support an inference that Gaudio and Requejado acted with deliberate indifference to Rios-Soto's right to be free from continued detention after they knew or should have known that he was entitled to release. Thus, the Complaint states a § 1983 claim against Gaudio and Requejado based on false imprisonment.

### 2. Whether Defendants Gaudio and Officer Requejado Violated Clearly Established Law

Clearly established law can come from a materially similar case that has already been decided; a broader, clearly established principle; or conduct that so obviously violates the constitution that prior case law is unnecessary. *Mercado*, 407 F.3d at 1158-59 (citations omitted). "More than a general legal proposition – for example, to act reasonably – is usually required; if a plaintiff relies on a general rule, it must be obvious that the general rule applies to the specific situation in question." *Youmans*, 626 F.3d at 563 (citing *Brousseau v. Haugen*, 125 S.Ct. 596, 599 (2004)).

The Eleventh Circuit has noted that the right against false imprisonment without due process "is clearly established." *Cannon*, 1 F.3d at 1564. Moreover, the Eleventh Circuit opinion recognizing the right to be free from continued detention after it should have been known that the detainee was entitled to release was issued over a decade before the incident in question. *See Cannon*, 1 F.3d 1558, 1563 (11th Cir. 1993). Although these are fairly general legal propositions, it should have been obvious that Detective Gaudio and Officer Requejado needed probable cause to continue detaining Rios-Soto and take him to the police station for questioning after the decision was made not to follow the procedures of the Baker or Marchman Acts.

Therefore, at this juncture in the case, the Court declines to grant Defendants Gaudio and Requejado qualified immunity for their continued detention of Rios-Soto after the decision was made not to transfer Rios-Soto to a hospital or other appropriate detention facility in accordance with the Marchman and Baker Acts.

## C. 42 U.S.C. § 1983 Claim Against the City

Count Nine asserts a § 1983 claim against the City for failure to train its officers "with regard to the handling of incidents involving persons with disabilities." (Compl. ¶ 146.) Municipalities and other local government entities are subject to liability under § 1983 and may be sued directly for relief where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436

U.S. 658, 690 (1978). A municipality or other local government entity "cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* at 691 (emphasis in original). Only if the alleged constitutional violations resulted from a custom, policy, or practice of a local government entity may that entity be held liable. *Id.* at 694; *Wideman v. Shallowford Cmty. Hosp., Inc.*, 826 F.2d 1030, 1032 (11th Cir. 1987); *see also Farred v. Hicks*, 915 F.2d 1530, 1532–33 (11th Cir. 1990) ("Governmental entities may be held liable under section 1983 when a governmental 'policy or custom' is the 'moving force' behind the constitutional deprivation.") (citing *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)).

A policy or custom "is established by showing a persistent and widespread practice and an entity's actual or constructive knowledge of such customs, though the custom need not receive formal approval." *German v. Broward Cty. Sheriff's Office*, 315 F. App'x 773, 776 (11th Cir. 2009) (citing *Depew v. City of St, Mary's, Ga.*, 787 F.2d 1496, 1499 (11th Cir. 1986)). The practice or custom must be "so pervasive, as to be the functional equivalent of a policy adopted by the final policymaker." *Church v. City of Huntsville*, 30 F.3d 1332, 1343 (11th Cir. 1994). For example, if a municipality's rules and regulations for the operation of its police department are repeatedly violated and the municipality has knowledge of the conduct but fails to rectify the situation, it may be liable. *Depew*, 787 F.2d at 1499 ("The continued failure of the [municipality] to prevent known constitutional violations by its police force is precisely the type of informal policy or custom that is actionable under section 1983."). However, "[n]ormally random acts or isolated incidents are insufficient to establish a custom or policy." *Id.*

The inadequacy of police training may serve as the basis for local government liability under § 1983 only "where the failure to train in a relevant respect amounts to deliberate indifference to the constitutional rights of persons with whom the police come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 379 (1989). To establish "deliberate indifference," "a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." *Gold v. City Of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998).

Soto alleges that the police department "had actual knowledge that persons with intensive behavioral needs lived at MACtown and in their community." (Compl. ¶ 18.) The Complaint includes a list of ten alleged interactions between the police department and MACtown residents. (*Id.*) Based on these incidents, Soto claims that the City "had notice of the need to train

regarding the needs of its own citizens with developmental disabilities . . . ." (*Id.* ¶ 147.) Soto also claims that the City "was deliberately indifferent to the constitutional rights of persons with Autism Spectrum Disorder or other intellectual or developmental disabilities, including Mr. Rios-Soto." (*Id.*¶ 149.)

The Eleventh Circuit has held that when a plaintiff relies on prior incidents to establish a pattern and practice, the incidents must involve similar facts to the case at hand. *Mercado*, 407 at 1162. Eight of the ten incidents described in the Complaint consist of police responding to reports of missing residents from MACtown or reports of burglaries at MACtown. (*Id.*) The descriptions of these incidents do not allege that the constitutional rights of the residents were violated; the Complaint simply states that the police were called to respond to the reported incidents. (*Id.*) Thus, these incidents do not demonstrate a widespread pattern or practice of police officers violating the constitutional rights of citizens with mental disabilities. *See Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1329 n. 21 (11th Cir. 2015) (stating that "[m]ere 'contacts' between deputies and mentally ill citizens are insufficient to put the Sheriff's Office on notice of the need for training . . . .").

Two of the incidents described in the Complaint do include allegations of more confrontational interactions between the police and residents of MACtown. On one occasion, the police arrested a resident of MACtown who had bitten his roommate on the lip. (Compl. ¶ 18.) The resident was transported to the jail and held overnight. (*Id.*) On a second occasion, Soto alleges that "North Miami Police responded to an incident at MACtown and tased a person with an intellectual disability." (*Id.*) This is the entire description of the incident. The descriptions of these two incidents do not include facts indicating that the police responses were unlawful or that violations of the residents' constitutional rights occurred. Thus, these incidents are also insufficient to establish a pattern or practice.

Finally, the Complaint alleges that "[u]pon information and belief, the staff and management at MACtown complained to North Miami officials, including its police chief, about the treatment of their residents when interacting with the police, but were ignored." (*Id.* ¶ 19.) However, the Complaint does not allege that these complaints concerned violations of the residents' constitutional rights similar to the alleged violation of Rios-Soto's rights. Therefore, this allegation is also insufficient to establish a pattern or practice. *See Weiland*, 792 F.3d at 1329 (conclusory allegations that city officials are "on notice of the need to promulgate, implement, and/or oversee policies pertaining to the use of force appropriate for the seizure of mentally ill persons" is insufficient to state a § 1983 claim (internal quotations marks omitted)); *Church*, 30 F.3d at 1344-46 (reversing district court's award of

preliminary injunction because the plaintiffs failed to establish that city employees had a pervasive practice of violating the plaintiffs' constitutional rights and there was no evidence that any final policymaker was aware of the incidents described at the preliminary injunction hearing).

In response to the City's motion to dismiss, Soto argues that a plaintiff may successfully bring a failure-to-train claim without showing a pattern of constitutional violations. (Pl.'s Resp. at 13, ECF No. 19.) The Eleventh Circuit has recognized that "[i]n *City of Canton v. Harris*, 489 U.S. 378 (1989), the Supreme Court in dictum left open the possibility that a need to train could be 'so obvious,' resulting in a City's being liable without a pattern of prior constitutional violations." *Gold*, 151 F.3d at 1352. The only example that the Supreme Court gave in *City of Canton* of such a circumstance was the need to train officers in the use of deadly force when they are provided with firearms. *Id.* (citing *City of Canton*, 489 U.S. at 390 n. 10)). The Supreme Court subsequently characterized this language as "simply hypothesizing in a narrow range of circumstances that a plaintiff might succeed without showing a pattern of constitutional violations . . . ." *Id.* (citing *Board of Cty. Comm'rs v. Brown*, 520 U.S. 397 (1997)).

Soto argues that "[t]his matter is one of the rare issues where the risk of constitutional violations is obvious in the abstract." (Pl.'s Resp. at 13, ECF No. 19.) In support of this argument, Soto asserts that given the small geographical size of the City and the past incidents of MACtown residents "eloping" from the facility, "[i]t was solely a matter of time that a person with a mental disability with intensive behavioral needs was a victim of police arresting, assaulting, or shooting a resident of the group home." (*Id.* at 13-14) However, the Eleventh Circuit has held that "'[it] is not enough to show that a situation will arise and that taking the wrong course in that situation will result in injuries to citizens.'" *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 490 (11th Cir. 1997) (quoting *Walker v. City of New York*, 974 F.2d 293, 299-300 (2nd Cir. 1992)).

In *City of Canton*, Justice O'Connor stated that "[t]he claim in this case – that police officers were inadequately trained in diagnosing the symptoms of emotional illness – falls far short of the kind of 'obvious' need for training that would support a finding of deliberate indifference to constitutional rights on the part of the city." 489 U.S. at 396-97 (O'Connor, J., concurring in part and dissenting in part). Similarly, the Eleventh Circuit has held that a claim that a city inadequately trained jail employees "to recognize the need to remove a mentally ill inmate to a hospital or to dispense medication as prescribed" does not constitute such an obvious need to train that it can support a finding of deliberate indifference to constitutional rights. *Young v. City of Augusta, Ga.*

*Through DeVaney*, 59 F.3d 1160, 1172 (11th Cir. 1995) (citing *City of Canton*, 489 U.S. at 396-397 (O'Connor, J., concurring in part and dissenting in part)).

Soto has not provided any case law holding that the need to train in a factually similar case was so obvious that the plaintiff did not need to establish a pattern or practice of similar constitutional violations. Therefore, similar to *City of Canton* and *Young*, the Court finds that the need to train in this case does not qualify as one of the "narrow range of circumstances that a plaintiff might succeed without showing a pattern of constitutional violations . . . ." *Gold*, 151 F.3d at 1352 (citing *Board of Cty. Comm'rs v. Brown*, 520 U.S. 397 (1997)). Accordingly, Soto has failed to state a § 1983 claim against the City.

### D. ADA and Rehabilitation Act Claims

Count Ten of the Complaint asserts a violation of Title II of the ADA against the City. Specifically, Soto alleges that the City treated Rios-Soto in a discriminatory fashion by assuming that Rios-Soto was a danger to himself and others solely because of his disability; arresting and imprisoning Rios-Soto solely because of his disability; failing to offer any assistance to Rios-Soto during the interrogation as required by Florida law and failing to provide training concerning interviews of individuals with autism as required by Florida law; and failing to provide police officers and employees training on interacting with people with autism, developmental disabilities, or intellectual disabilities. (Compl. ¶ 156.) Count Eleven of the Complaint asserts a violation of the Rehabilitation Act, based on similar allegations of discrimination as those set forth in the ADA claim. (*Id.* ¶ 165.)

Pursuant to Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The Rehabilitation Act similarly provides that no "qualified individual with a disability . . . shall, solely by reason of his or her disability . . . be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794. Due to the similarities between the two statutes, courts generally apply the same standard to claims arising under the ADA and the Rehabilitation Act. *See, e.g.*, *Silva v. Baptist Health South Florida, Inc.*, 856 F.3d 824, 830 (11th Cir. 2017) ("ADA and RA claims are governed by the same substantive standard of liability") (citing *Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000)).

"Under the ADA and RA, a discrimination claim based on an arrest situation usually arises in two different situations: (1) when police wrongfully arrest someone by mistaking his disability for criminal conduct, and (2) when

police properly investigate and arrest someone with a disability . . . and then fail to reasonably accommodate the disability . . . ." *Bircoll v. Miami-Dade Cty.*, 410 F.Supp.2d 1280, 1285 (S.D. Fla. 2006), *aff'd*, 480 F.3d 1072 (11th Cir. 2007), (citing *Gohier v. Enright*, 186 F.3d 1216, 1220-21 (10th Cir. 1999)). In order to state a claim under the Rehabilitation Act or Title II of the ADA, a plaintiff must allege that: (1) the subject of the discrimination was a qualified individual with a disability, (2) that he or she was discriminated against by a public entity, and (3) that the discrimination was due to the disability. *Suarez v. City of Hollywood*, No. 16-62215, 2016 WL 8738228, at *3 (S.D. Fla. Dec. 5, 2016) (Dimitrouleas, J.). In addition, "[t]o prevail on a claim for compensatory damages under either the RA or the ADA, a plaintiff must show that a defendant violated his rights under the statutes and did so with discriminatory intent." *McCullum v. Orlando Reg'l Healthcare Sys.*, 768 F.3d 1135, 1146-47 (11th Cir. 2014) (citations omitted). Since Soto seeks compensatory damages, she must meet this standard.

Proof of discriminatory intent is an "exacting standard, which requires showing more than gross negligence. To establish deliberate indifference, a plaintiff must show that the defendant *knew* that harm to a federally protected right was substantially likely and *failed* to act on that likelihood." *Id.* at 1147 (internal quotations and citations omitted) (emphasis in original). Soto generally alleges that the Defendants actions "were intentional and with reckless disregard and deliberate indifference for Rios-Soto's rights as a person with a disability." (Compl. ¶¶ 159, 168.) However, if a complaint does not include specific factual allegations showing that a police officer "knew that the plaintiff was disabled or knew that his actions were substantially likely to violate the plaintiff's rights under the ADA or RA," it is subject to dismissal. *See Boynton v. City of Tallahassee*, 650 Fed. Appx. 654, 658-59 (11th Cir. 2016).

With respect to Soto's claim that the City arrested and imprisoned Rios-Soto solely because he had a disability, "there must be a causal link between a plaintiff's disability and the wrongful arrest; i.e., no other probable cause for the arrest exists." *Bircoll*, 410 F.Supp.2d at 1285. However, as discussed in Section 3B, *supra*, the allegations in the Complaint establish that, at least initially, the officers had probable cause to restrain Rios-Soto in order to take him into protective custody. With respect to the continued detention and questioning of Rios-Soto, it is unclear to the Court how attempting to obtain a statement from Rios-Soto could constitute a discriminatory action. Moreover, the factual allegations are insufficient to support an inference that Gaudio and Requejado continued detaining Rios-Soto and took him to the station for questioning solely on the basis of his disability.

Soto also claims that the City failed to provide the assistance mandated by Florida Statute 943.0439 to Rios-Soto during the interrogation. Florida Statute 943.0439 requires that, "upon request of an individual diagnosed with autism or an autism spectrum disorder or his or her parent or guardian," a law enforcement officer is required to "make a good faith effort to ensure that a psychiatrist, psychologist, mental health counselor, special education instructor, clinical social worker, or related professional is present at all interviews of the individual." This claim fails for three reasons. First, the statute specifically says that failure to have a professional present at the time of the interview is not a basis for a cause of action against the law enforcement officer or agency. Fla. Stat. § 943.0439(1). Second, the Complaint does not allege that Rios-Soto, Bower, or anyone else made a request for such assistance. Finally, although this claim would logically be categorized as a failure to accommodate claim, Soto's response to the City's motion to dismiss states that "as this is a disparate treatment case, and not a reasonable accommodation case, whether there was a request for an accommodation is irrelevant." (Pl.'s Resp. at 16-17, ECF No. 19.)

The only allegation of disparate treatment included in Counts Ten and Eleven is that Rios-Soto was arrested and imprisoned "solely because he had a disability, when any other non-disabled witness to a shooting would have been allowed to choose whether to provide a statement and leave." (Compl. ¶¶ 156, 165.) This allegation is conclusory and there are no other factual allegations in the Complaint to support a claim that Rios-Soto was treated differently than other individuals in similar situations.

Since the allegations are insufficient to establish that Rios-Soto was arrested and detained solely because he had a disability, or that he was treated differently on the basis of his disability, Counts Ten and Eleven are dismissed.

### E. FHA Claim

Count Twelve asserts a claim under the Fair Housing Act ("FHA") against the City and the individual Defendants, alleging that "[b]y failing to implement policies and train its officers relating to the needs of persons with disabilities, the City of North Miami has discriminated in the provision of municipal utility services that are essential to the use and enjoyment of housing – such as police services – based upon disability . . . ." (Compl. ¶ 172.) Soto also alleges that Rios-Soto was "targeted as he was Hispanic Man with a mental disability who was accompanied by a Black Man who was wearing street clothes," and that the Defendants' actions in falsely arresting, imprisoning, and interrogating Rios-Soto "makes it impossible for Rios-Soto to continue to live in North Miami, and creates a dangerous environment for any resident of North Miami that lives

with a developmental or intellectual disability." (*Id.* ¶¶ 173, 176.) Finally, Soto alleges that the discriminatory services made housing unavailable to Rios-Soto, as he was forced to move out of the only group home in South Florida that could meet his needs. (*Id.* ¶ 180.)

Soto alleges that the Defendants have violated Sections 3604(b) and (f) of the FHA. Section 3604(b) makes it unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." Section 3604(f) makes it unlawful, in relevant part:

> (1) To discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of
>> (A) that buyer or renter;
>> (B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available;
>> (C) any person associated with that buyer or renter
>
> (2) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of –
>> (A) That person; or
>> (B) A person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or
>> (C) Any person associated with that person.

However, the FHA does not require "that a dwelling be made available to an individual whose tenancy would constitute a direct threat to the health or safety of other individuals or whose tenancy would result in substantial physical damage to the property of others." *Id.* § 3604(f)(9).

As an initial matter, the Court doubts that the actions of the police officers in this case are sufficiently related to the sale or rental of a dwelling, or "the provision of services or facilities in connection therewith," to support a cause of action under the FHA. *See Lawrence v. Courtyards at Deerwood Ass'n, Inc.*, 318 F.Supp.2d 1133, 1142-43 (S.D. Fla. 2004) (Huck, J.) (holding that 42 U.S.C. § 3604(b) is limited to conduct that directly impacts the accessibility to housing). Although the parties did not address this threshold issue, none of the cases cited by the parties involve a factual situation even remotely analogous to this case, and the Court has not been able to find any.

Even assuming that the officers' actions are related to housing or the provision of services in connection with housing, the Plaintiff's claim fails. The

Eleventh Circuit has held that "[i]n a discrimination case, before discovery has unearthed relevant facts and evidence, it may be difficult to define the precise formulation of the required prima facie case. Thus, the allegations in the complaint should be judged by the statutory elements of an FHA claim . . . ." *Hunt v. Aimco Properties, L.P.*, 814 F.3d 1213, 1221-22 (internal quotations, alterations, and citations omitted). With respect to Soto's claim that the officers' actions violated 42 U.S.C. § 3604(f), the Court has already concluded that the factual allegations are insufficient to establish that the officers discriminated against Soto on the basis of his disability.

With respect to Soto's claim that Rios-Soto was targeted because he was Hispanic and accompanied by a black man, the only allegation in the Complaint that could conceivably support this claim is the allegation that "Had Mr. Rios-Soto have been [sic] accompanied by a therapist who was a White Woman, wearing a traditional nurse's uniform of a dress, apron, and cap, Mr. Rios-Soto would not have been stereotypically identified as a threat . . . and his therapist would not have been shot." (Compl. ¶ 174). However, this is entirely speculative and is not supported by the other factual allegations in the Complaint, especially in light of the Court conclusion that the officers had probable cause to take Rios-Soto into protective custody. Accordingly, Count Twelve is dismissed because the allegations are insufficient for the Court to infer that the officers discriminated against Rios-Soto on the basis of race or disability.

### F. 42 U.S.C. § 1982 Claim

Count Thirteen asserts a claim against the City and the individual Defendants under 42 U.S.C. § 1982. 42 U.S.C. § 1982 provides that "[a]ll citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." Based on similar allegations as those asserted in support of the Plaintiff's FHA claim, the Plaintiff argues that the Defendants' actions "are violations of his right to have the same rights as enjoyed by other citizens to lease and hold and [sic] real and personal property because of race . . . ." (Compl. ¶ 190.) However, there are no allegations in the Complaint that Rios-Soto sought to inherit, purchase, lease, sell, hold, or convey real property, or that the Defendants interfered with such rights. *See City of Memphis v. Greene*, 451 U.S. 100, 123 (1981) (holding that "the threshold inquiry under § 1982 must focus on the relationship between" the conduct at issue and "the property interests of the respondents"); *Lawrence*, 318 F.Supp.2d at 1150 ("Section 1982 was never intended to, and does not reach, every alleged racially discriminatory act that is somehow

related to housing"); *Hill v. Impro Synergies LLC*, No. 1:15cv101, 2015 WL 9942045, at *3 n. 1 (N.D. Fla. Nov. 25, 2015) (noting that "it seems that a § 1982 plaintiff . . . must identify some property interest of their own that has been impaired."); *New Christian Valley M.B. Church v. Board of Educ. Of School Dist. No. 149*, 704 F.Supp. 868, 870 (N.D. Ill. 1989) (holding that "[t]he individual plaintiffs cannot allege that the defendants denied them the right to lease and hold real property unless they show that they attempted to do so); *but see U.S. v. Brown*, 49 F.3d 1162, 1166-67 (6th Cir. 1995) (holding that the legislative history of § 1982 "supports the proposition that a Jewish person's 'use' of property is protected under Section 1982").

Moreover, as discussed above, Soto has failed to allege facts sufficient to support an inference that the officers intentionally discriminated against Rios-Soto on the basis of his race. *See Henderson v. JP Morgan Chase Bank, N.A.*, 436 Fed. Appx. 935, 937 (11th Cir. 2011) (holding that a complaint alleging discrimination must contain sufficient factual matter to support a reasonable inference that the defendant engaged in racial discrimination); *Lawrence*, 318 F.Supp.2d at 1149-50 (a plaintiff must allege facts to show that the defendant intended to discriminate on the basis of race to sustain a § 1982 claim). Therefore, Soto has failed to state a claim under § 1982.

## 3. Conclusion

For the foregoing reasons, the City's motion to dismiss is **granted** (**ECF No. 14**); Defendant Aledda's motion to dismiss is **granted** (**ECF No. 27**); and Defendants Warren, Requejado, Crespo, and Gaudio's motion to dismiss is **granted in part and denied in part** (**ECF No. 15**). Accordingly, Counts One through Six are **dismissed without prejudice** as to each of the individual Defendants. Counts Seven and Eight are **dismissed without prejudice** as to Defendant Aledda, and **dismissed with prejudice** as to Defendants Warren and Crespo. Counts Seven and Eight are **dismissed with prejudice** as to Defendants Requejado and Gaudio solely with respect to the Plaintiff's unlawful arrest claim, but may proceed against Defendants Requejado and Gaudio with respect to the Plaintiff's false imprisonment claim. Counts Nine, Ten, and Eleven are **dismissed without prejudice** as to the City. Counts Twelve and Thirteen are **dismissed without prejudice** as to all Defendants.

Since the Plaintiff's briefing on the Defendants' motions to dismiss makes clear that she intended to assert a § 1983 claim for excessive force, the Plaintiff may amend the Complaint to include such a claim. In addition, if the Plaintiff has a good faith basis to correct the deficiencies in Counts One through Six and Counts Nine through Thirteen, she may amend those claims as well. If the

Plaintiff wishes to amend the complaint, she must file the amended complaint on or before **October 26, 2017**.

**Done and ordered**, at Miami, Florida, on October 16, 2017.

Robert N. Scola, Jr.
United States District Judge